**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **LISA K. POMEROY,** | **)** | |
| | **)** | |
| **Plaintiff,** | **)** | |
| | **)** | |
| **v.** | **)** | **CAUSE NO. 1:14-cv-00342-SLC** |
| | **)** | |
| **COMMISSIONER OF SOCIAL SECURITY,** ***sued as Carolyn W. Colvin,*** | **)** | |
| | **)** | |
| **Defendant.** | **)** | |

## OPINION AND ORDER

Plaintiff Lisa K. Pomeroy appeals to the Court from a final decision of the Commissioner of Social Security denying her application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[1] (DE 1). For the following reasons, the Commissioner's decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

Pomeroy applied for DIB in June 2012, alleging disability as of March 7, 2011. (DE 10 Administrative Record ("AR") 21, 163-69). The Commissioner denied Pomeroy's application initially and upon reconsideration, and Pomeroy requested an administrative hearing. (AR 109-25). On June 21, 2013, a hearing was conducted by Administrative Law Judge Patricia Melvin ("the ALJ"), at which Pomeroy, who was represented by counsel, and vocational expert Charles McBee ("the VE") testified. (AR 67-108).

On August 22, 2013, the ALJ rendered an unfavorable decision to Pomeroy, concluding that she was not disabled because despite the limitations caused by her impairments, she could

[1] All parties have consented to the Magistrate Judge. (DE 13); *see* 28 U.S.C. § 636(c).

perform a significant number of sedentary jobs in the economy. (AR 21-30). The Appeals Council denied Pomeroy's request for review (AR 1-7), at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. § 404.981.

Pomeroy filed a complaint with this Court on October 30, 2014, seeking relief from the Commissioner's final decision. (DE 1). Pomeroy argues in this appeal that the ALJ improperly discounted the opinions of Drs. Amy Johnson, J. Larsen, and Andrew Combs and improperly discounted the credibility of Pomeroy's symptom testimony. (DE 18 at 9-15).

## II. FACTUAL BACKGROUND[2]

### *A. Background*

At the time of the ALJ's decision, Pomeroy was 43 years old (AR 163); had a high school education (AR 72, 204); and had studied medical assisting at Ivy Tech, although she did not finish the program (AR 72). Her past work experience included work as a quality assurance inspector and a store laborer. (AR 105, 204). Pomeroy alleges disability due to fibromyalgia, headaches, obesity, degenerative changes and disc bulges in the cervical spine, carpal tunnel syndrome, and depression. (DE 18 at 2).

### *B. Pomeroy's Testimony at the Hearing*

At the hearing, Pomeroy, who was about four feet, eleven inches tall and weighed 150 pounds, testified that she lives in a house with her nine-year-old daughter and 20-year-old son; she and her husband were divorcing. (AR 71, 382). Her job at a Walmart distribution center ended after she injured her neck at work. (AR 73-75). Pomeroy bathes and dresses independently; she does all of the shopping for the household and some of the cooking, washing

[2] In the interest of brevity, this Opinion recounts only the portions of the 541-page administrative record necessary to the decision.

dishes, vacuuming, cleaning, bed making, and laundry. (AR 96-99). She also drives a car. (AR 96). Pomeroy testified that in a typical day she performs about 15 minutes of household tasks and caring for pets, but then needs to rest due to pain and fatigue. (AR 99-100).

Pomeroy stated that the primary reason she cannot work is due to constant "nerve pain" in her hands and feet, which started after her neck injury. (AR 75-76). On a scale of one to 10, she rated her pain on an average day as a seven with medication and an eight without, stating that her prescribed medications were only minimally helpful. (AR 76). She does not experience any medication side effects. (AR 77). Her pain is aggravated by staying in one position too long, so she repositions herself frequently. (AR 79). She stated that her neuropathy causes her to fall down three or four times a week, so she uses a cane; she asserted that her family doctor, Dr. Stewart, encouraged her to use a cane, but did not write a prescription for it. (AR 90-91). Additionally, Pomeroy asserted that she falls "[a]bout every time" she "lean[s] over at a certain angle," such as when she leans over to pick something out of the garden. (AR 95; *see* AR 102).

Pomeroy also complained of pain in her hands, which she attributed both to carpal tunnel syndrome and her neck injury. (AR 79-80). She underwent surgery for carpal tunnel syndrome, but she still experiences constant weakness, pain, and swelling in her "whole entire hands." (AR 80). She rated her hand pain as a seven, stating that the surgery improved it only slightly. (AR 81). Her pain and swelling worsen when she uses her hands for repetitive tasks, such as doing dishes for 10 minutes, so she has to take frequent breaks. (AR 82).

Next, Pomeroy stated that she suffers from severe headaches, which also started after her neck injury. (AR 83). These occur once every two weeks and last two to three days; the headaches cause vomiting. (AR 83-86). Medications help relieve the pain only slightly. (AR

84, 86). Her headaches are aggravated by noise, stress, bright lights, and being around people. (AR 85).

Pomeroy also complained of pain and fatigue due to fibromyalgia, which started after her neck injury. (AR 87). Her fibromyalgia causes her pain at a level eight "from head to toe" "all day every day," and thus, she rests frequently. (AR 88). Again, her medications are not very helpful in reducing her pain and fatigue. (AR 89).

When asked about her physical capacity, Pomeroy stated that she could walk a few blocks and shop with a grocery cart for about a half hour (AR 92); she can sit for an hour at a time (AR 92-93). She estimated that she can lift seven pounds. (AR 93). Sometimes she has difficulty gripping things with her hands, but she usually can fasten buttons and zippers. (AR 93-94). She stated that driving a car too long causes problems with her legs. (AR 94).

*C. Summary of the Medical Evidence*

In February 2011, Pomeroy sustained an injury while working at a Walmart distribution center when she made a turn while in a lift and heard a pop in her neck, followed by a burning sensation. (AR 302, 361, 381, 387). She finished her shift, but woke during the night with severe pain in her neck and shoulders and numbness and tingling in both arms. (AR 361). She went back to sleep and went to work the next day. (AR 361). She saw the company doctor, who told her it was a sprain and sent her back to work. (AR 361). An MRI of the cervical spine on March 7, 2011, showed some degenerative changes but no specific acute problem. (AR 361). She continued to complain of headaches and pain in her shoulders and temples, which worsened when bending down, moving her head, or lifting. (AR 361). She saw her family doctor, who prescribed Tramadol and Flexeril. (AR 361).

On March 28, 2011, Pomeroy was examined by Dr. Jose Panszi in the neurology department at Caylor-Nickel Clinic. (AR 361-62). Her mental status was "completely normal." (AR 361). She had some tenderness in the cervical occipital areas, and her neck was supple with some tenderness; the rest of the examination was normal. (AR 361-62). He opined that she had soft tissue damage with some inflammation, ordered an MRI, and recommended she take ibuprofen. (AR 362). The MRI results were normal. (AR 365). Pomeroy returned to Dr. Panszi in May, complaining of continued pain in the cervico-occipital area bilaterally extending to her shoulder girdles; an examination revealed no specific evidence of problems. (AR 365). He stated that diagnostic testing did not explain Pomeroy's complaints, as the results of the MRI were normal and an EMG showed mild carpal tunnel syndrome. (AR 365, 445-46). Dr. Panszi prescribed Topamax and explained to Pomeroy that her muscle pain may be significant and that she may want to think about changing to a job that is less physically demanding. (AR 365).

In June 2011, Pomeroy returned to Dr. Panszi, complaining of symptoms in her neck and arms that occurred daily and were "incapacitating." (AR 366-70). The symptoms were aggravated by movements of the head and were lessened by heat, ice, rest, and medication; she also complained of intermittent pain in her legs. (AR 366). An examination revealed normal gait, range of motion, and strength in all extremities; her cervical spine was tender, and she had mild pain with movement. (AR 368). Her sensation, balance, coordination, and fine motor skills were intact. (AR 369). The following month, Pomeroy complained to Dr. Panszi of a daytime headache of five-months duration that occurred daily and radiated to her neck, describing it as "blinding and pressure"; she also complained of neck stiffness and numbness in all her extremities. (AR 371). Symptoms were aggravated by head positioning, stress, and activity;

physical examination findings, however, were unchanged. (AR 371).

Dr. Andrew Combs performed a left carpal tunnel release on Pomeroy on July 7, 2011. (AR 308). She received approximately 30 occupational therapy treatments following surgery. (AR 310-17). In August 2011, Dr. Combs released Pomeroy to return to work with the following restrictions: no lifting or carrying more than three pounds and no repetitive work with either arm. (AR 321). He scheduled her for a follow-up visit in four weeks. (AR 321). Pomeroy was discharged from occupational therapy in September 2011, at which time her hand strength tested within functional limits. (AR 317).

In August 2011, Dr. Gordon Hughes, a rheumotologist, examined Pomeroy for her complaints of joint pain. (AR 294-95). She told Dr. Hughes that she had filed a lawsuit against Walmart because it denied her workers compensation. (AR 294). Dr. Hughes noted that her MRI showed some disc bulges at C5-6 and C6-7, but no herniation and limited facet joint arthritis. (AR 294). Pomeroy rated her pain as a 10. (AR 294). An examination revealed that she was "exquisitely tender in her upper trapezius with triggering." (AR 295). She demonstrated 70 degrees of cervical spine rotation to the left and 80 to 85 degrees on the right. (AR 295). His impression was that Pomeroy could have some early posttraumatic osteoarthritis of the cervical spine, but that her upper extremity radicular pain was resolving; he opined that her myofascial pain appeared consistent with fibromyalgia-type symptomatology. (AR 295). He restricted her from lifting more than 15 to 20 pounds, prescribed Flexeril and meloxicam, and recommended that she use heat, stretching, stress reduction, and mild exercise. (AR 295).

In November 2011, Pomeroy returned to Dr. Hughes. (AR 336-38). He observed moderate pain on palpation of tender points, together with symptoms of localized pain,

headache, and paresthesia. (AR 336). An examination revealed normal range of motion and strength. (AR 337). He assigned diagnoses of fibromyalgia and osteoarthritis. (AR 337). Pomeroy returned to Dr. Hughes in May 2012, complaining of worsening pain, pressure, and "grinding" in her neck. (AR 332). She stated that the neck pressure causes her leg problems to where she cannot walk; she also complained of fatigue. (AR 332). She rated her pain as a seven. (AR 332). She demonstrated reduced neck range of motion and complained of back pain. (AR 332). In July 2012, fibromyalgia trigger points were noted. (AR 336).

Pomeroy saw Dr. Thomas Stewart, her family physician, about 30 times from October 2010 to February 2013; he saw her for various physical complaints, as well as for anxiety and depression for which he prescribed psychotropic medication. (AR 472-508). In July 2012, Dr. Stewart completed a medical source statement indicating that Pomeroy must change position every 15 minutes from sitting to standing. (AR 340). He stated that although she tires easily when walking, her ambulation had not been affected by her impairments and an assistive device had not been recommended. (AR 341). He also stated that Pomeroy has problems opening jars and that her hands become numb when she holds a telephone, so she has to switch hands. (AR 34). He wrote that Pomeroy can do tasks for 15 minutes at a time, but then must take a break and rest. (AR 340).

In August 2012, Pomeroy underwent a mental status examination by Henry Martin, Ph.D., at the request of Social Security. (AR 381-85). Her mood and affect were anxious and depressed, but her primary concern centered around her chronic pain and fatigue. (AR 382). Dr. Martin diagnosed her with depression, secondary to medical issues, and assigned her a Global

Assessment of Functioning ("GAF") score of 55.[3] (AR 384).

Later that same month, Amy Johnson, Ph.D., a state agency psychologist, reviewed Pomeroy's record, including Dr. Martin's recent opinion, and completed psychiatric review technique and mental RFC forms. (AR 393-96, 428-31). On the psychiatric review technique, Dr. Johnson found that Pomeroy had moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace, and mild restrictions in activities of daily living. (AR 403). On the mental RFC form, Dr. Johnson indicated that Pomeroy was moderately limited in understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; interacting appropriately with the general public; getting along with coworkers without distracting them or exhibiting behavioral extremes; and responding appropriately to changes in the work setting. (AR 428-29). Dr. Johnson concluded that Pomeroy had the mental capacity to understand, remember, and follow simple instructions and should be restricted to work that involves brief, superficial interactions with coworkers and the public. (AR 430). Dr. Johnson further opined that within these parameters and in the context of performing simple, routine, repetitive, concrete, and tangible tasks, Pomeroy was able to sustain attention and concentration skills to carry out work-like tasks with reasonable pace and persistence. (AR 430). Dr. Johnson's opinion was later affirmed by another non-examining state agency psychologist, Dr. Joelle Larsen. (AR 540).

---

[3] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* "The American Psychiatric Association no longer uses the GAF as a metric." *Spencer v. Colvin*, No. 13-cv-1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013)). However, the medical sources of record used GAF scores in assessing Pomeroy, so they are relevant to the ALJ's decision. *See id*. (citing *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013)).

Also in August 2012, Pomeroy underwent a disability physical by Dr. William Terpstra. (AR 387-88). An examination revealed that her gait, muscle strength, and fine and gross motor movements were all normal; she was able to walk on toes and heels, squat, and tandem walk without difficulty. (AR 388). He concluded that she could stand or walk at least two hours in an eight-hour workday and could lift and carry less than 10 pounds frequently and more than 10 pounds occasionally. (AR 388). He expected that work-related activities such as standing, walking, lifting, and carrying would be moderately impaired, but that sitting, handling objects, hearing, seeing, and speaking were not impaired. (AR 388). He could not detect any mental impairment, commenting that her understanding, memory, concentration, and social interaction all seemed appropriate. (AR 388).

Also in August 2012, Dr. J. Corcoran, a state agency physician, reviewed Pomeroy's record and completed a physical RFC form. (AR 407-14). He concluded that she could stand or walk six hours in an eight-hour workday, sit for six hours in an eight-hour workday, lift 25 pounds frequently and 50 pounds occasionally, and perform unlimited pushing and pulling within her lifting restrictions. (AR 408). He found that no manipulative limitations, which included reaching, handling, fingering, and feeling, were necessary. (AR 410). Dr. Corcoran's opinion was later affirmed by a second state agency physician, Dr. M. Brill. (AR 541).

In September 2012, Pomeroy saw Dr. Hughes, complaining of difficulty sleeping and numbness and tingling in her extremities. (AR 416). She also had chronic fatigue and moderate pain on palpation of tender points. (AR 416).

In November 2012, Pomeroy went to the emergency room for a headache, rating her pain as a 10. (AR 463). She also complained of vomiting, light sensitivity, dizziness, and

paresthesias in her arms. (AR 463). An examination revealed non-tender, full range of motion. (AR 464). She was diagnosed with a migraine headache and given "the migraine cocktail" of Toradol, Zofran, and Benadryl. (AR 464).

In January 2013, Pomeroy complained to Dr. Hughes of pain from the middle of her neck down into her ankles, together with severe headaches, nausea, and vomiting. (AR 455). She had moderate pain on palpation of tender points. (AR 455).

In February 2013, Pomeroy saw Dr. David Whittbrodt at Ortho Northeast for complaints of her right knee and lower leg "giving way," causing her to fall. (AR 438). She also complained of radiating leg pain. (AR 438). Upon examination, Pomeroy could walk on toes and heels, her knee was stable with 130 degrees of motion, her calf was non-tender, and the strength in her quadriceps was symmetrical. (AR 439). Dr. Whittbrodt did not find anything specific to the knee that was causing Pomeroy's problems; he indicated it was likely more of a proximal problem in the head or neck area. (AR 439). He recommended that she see a neurologist for further evaluation and that she perform aerobic exercise such as biking or an elliptical machine, where she would be less likely to fall down if her leg gives out.[4] (AR 439).

## III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

---

[4] The record further reflects that after the ALJ issued her decision, Pomeroy attended mental health counseling at Family Service Society, Inc., and underwent a psychological evaluation by Arthur Kupersmith, Ph.D. (AR 43-66). However, because Pomeroy received this mental health treatment after the ALJ issued her decision, this evidence may not be used to assess the validity of the ALJ's decision. *See Eads v. Sec'y of Health & Human Servs.*, 983 F.2d 815, 817 (7th Cir. 1993) ("The correctness of [the ALJ's] decision depends on the evidence that was before him.").

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record, but does not "reweigh the evidence, resolve conflicts, decide questions of credibility," or substitute its judgment for the Commissioner's. *Id.* (citations omitted). Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. ANALYSIS

### *A. The Law*

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months . . . ." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process,

requiring consideration of the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 404.1520. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

*B. The ALJ's Decision*

On August 22, 2013, the ALJ issued the decision that ultimately became the Commissioner's final decision. (AR 21-30). She found at step one that Pomeroy had not engaged in substantial gainful activity since March 7, 2011, her alleged onset date. (AR 23). At step two, the ALJ concluded that Pomeroy had the following severe impairments: fibromyalgia, headaches, mild obesity, and degenerative changes and disc bulges in her cervical spine. (AR 23). At step three, the ALJ determined that Pomeroy's impairment or combination of impairments were not severe enough to meet a listing. (AR 26). Before proceeding to step four, the ALJ assigned Pomeroy the following RFC:

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

> [T]he claimant has the [RFC] to perform sedentary work . . . except that she is able to lift and carry less than 10 pounds frequently and more than 10 pounds occasionally. In an eight-hour period, she is able to sit for a total of 6 hours and stand/walk for a total of 2 hours. She is not able to climb ladders, ropes, or scaffolds at all and she can only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.

(AR 26).

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Pomeroy was unable to perform any of her past relevant work. (AR 29). The ALJ then concluded at step five that Pomeroy could perform a significant number of sedentary jobs in the economy, including document preparer, telephone quotation clerk, and table worker. (AR 30). Therefore, Pomeroy's claim for DIB was denied. (AR 30).

*C. Substantial Evidence Supports the ALJ's Decision to Assign "Little Weight" to the State Agency Psychologists' Opinions and to Find Pomeroy's Mental Impairment Non-Severe*

Pomeroy first argues that the ALJ erred by rejecting the opinions of Drs. Johnson and Larsen, the state agency psychologists, who found that she had moderate limitations in maintaining social functioning and in maintaining concentration, persistence, or pace. For the following reasons, the ALJ's decision to assign "little weight" to the state agency psychologists' opinions and to conclude that Pomeroy's mental impairment was non-severe is supported by substantial evidence.

To review, Dr. Johnson found on the psychiatric review technique form that Pomeroy had moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace, and mild restrictions in activities of daily living. (AR 403). Additionally, Dr. Johnson found on the mental RFC form that Pomeroy was moderately limited in understanding, remembering, and carrying out detailed instructions; maintaining attention and

concentration for extended periods; interacting appropriately with the general public; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; and responding appropriately to changes in the work setting. (AR 428-29). Dr. Johnson concluded in his narrative that Pomeroy could sustain attention and concentration to carry out simple, repetitive, work-like tasks with reasonable pace and persistence where the work involved only brief, superficial interactions with co-workers and the public. (AR 430). Dr. Larsen later affirmed Dr. Johnson's findings and narrative conclusions. (AR 540).

The ALJ reviewed Dr. Johnson's opinion, as affirmed by Dr. Larsen, but ultimately decided to assign it "little weight," concluding at step two that Pomeroy was "at most, only mildly limited by her mental impairments in her ability to perform activities of daily living, maintain social functioning, and sustain concentration, persistence, or pace." (AR 25-26). In doing so, the ALJ adequately explained his rationale and cited reasons that are grounded in the record.

"[T]he administrative law judge is not required or indeed permitted to accept medical evidence if it is refuted by other evidence—*which need not itself be medical in nature* . . . ." *Simila v. Astrue*, 573 F.3d 503, 515 (7th Cir. 2009) (alteration in original) (quoting *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995)); *see also Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 356 (7th Cir. 2005). "But where there is no such evidence, the ALJ cannot . . . disregard the medical opinion." *Briscoe ex rel. Taylor*, 425 F.3d at 345.

Here, as the ALJ observed, the opinions of Drs. Johnson and Larsen, as well as the opinion of Dr. Martin,[6] are amply refuted by other medical and nonmedical evidence of record.

[6] Pomeroy does not challenge the ALJ's discounting of Dr. Martin's opinion.

The ALJ first acknowledged that although Dr. Stewart prescribed Pomeroy psychotropic medications in response to her complaints of depression and anxiety, his progress notes did not contain any references to severe difficulties in cognitive or social functioning. (AR 25). The Court's own review of Dr. Stewart's records reveals that aside from noting depression and anxiety on occasion, Dr. Stewart rarely documented any mental symptoms with specificity; rather, he primarily treated Pomeroy for her physical complaints. (*See* AR 339-41, 472-508).

Additionally, the ALJ observed that Pomeroy's presentation to various other medical sources with respect to her mental status was largely within normal limits. (AR 25). To illustrate this point, the ALJ cited a host of comments from the notes of Dr. Panszi, a neurologist; Dr. Terpstra, an examining doctor; Dr. Hughes, a rheumotologist; and an emergency room doctor, belying any severe mental limitations. (AR 25 (citations omitted)). To cite just a few, these comments include: "[a]lert and oriented" (AR 456); "[m]ental status was completely normal" (AR 361); "I could not detect any mental impairment today" (AR 388); "[u]nderstanding, memory and concentration seemed adequate" (AR 388); "social interaction with [the doctor] was appropriate" (AR 388); "normal mood/affect, calm, alert" (AR 464); and "[c]ooperative, [a]ppropriate mood & affect, [n]ormal judgment" (AR 333, 418). As the ALJ observed, these notes of the non-mental health specialists of record undercut the conclusions of Drs. Johnson and Larsen. *See Denton v. Astrue*, 596 F.3d 419, 423-24 (7th Cir. 2010) (affirming the ALJ's finding that the claimant's depression was a non-severe impairment where the claimant never mentioned a lack of interest in activities, social isolation, or mood swings to her treating doctors).

Furthermore, the ALJ did not solely rely on the medical findings of the non-mental health

specialists when discounting the opinions of Drs. Johnson and Larsen and concluding that Pomeroy's mental impairment was non-severe. Rather, the ALJ cited four other reasons for finding that Pomeroy had, at most, just mild mental limitations. These reasons include that Pomeroy had not been hospitalized for a psychiatric reason, that she had not sought outpatient mental health treatment, that she did not even mention her mental difficulties at the hearing, and that she engaged in a "somewhat full range of daily activities." (AR 25-26).

The Court agrees with Pomeroy that the first of these four reasons does not bolster the ALJ's finding. "A lack of psychiatric hospitalizations is not necessarily inconsistent with a severe mental impairment." *Gillim v. Colvin*, No. 11 C 7146, 2013 WL 1901630, at *6 (N.D. Ill. May 7, 2013) (citation omitted); *see Adkins v. Astrue*, No. 309-CV-217, 2010 WL 3782388, at *9 (N.D. Ind. Sept. 21, 2010) (noting that there was no evidence in the record "that severe mental impairments necessarily (or even generally) result in hospitalization"). The remaining three reasons, however, amply support the ALJ's decision to discount the opinions of Drs. Johnson and Larsen.

In that regard, Pomeroy concedes that she did not seek outpatient mental health counseling or psychological evaluation prior to the date the ALJ issued her decision. (DE 30 at 3). As the Seventh Circuit Court of Appeals has articulated, "[the claimant] bears the burden of producing medical records showing her impairment, and if she never sought medical treatment for a condition, then she cannot meet that burden." *Denton*, 596 F.3d at 424 (citations omitted)); *Borland v. Astrue*, No. 10-C-0092, 2010 WL 5209380, at *9 (E.D. Wis. Dec. 16, 2010) (affirming the ALJ's finding that the claimant's mental impairment was non-severe where the claimant had received no specialized or sustained treatment for a mental illness).

Pomeroy also does not contest the fact that she never even mentioned her mental impairments when repeatedly asked by the ALJ at the hearing about the reasons why she thought she could not work. (AR 75, 83, 87, 90, 91). Pomeroy was represented by counsel at the hearing. "[A]n ALJ is entitled to presume that a claimant represented by counsel in the administrative hearings has made [her] best case." *Sears v. Bowen*, 840 F.2d 394, 402 (7th Cir. 1988) (citing *Glenn v. Sec'y of Health & Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987)).

Additionally, as the ALJ observed, Pomeroy engages in a fairly full range of daily activities (AR 26), which she described at the hearing as being punctuated by periods of rest (AR 27). She attributed this need to rest to her pain and fatigue from her physical ailments, not to any mental impairment. (AR 96-100); *see Borland*, 2010 WL 5209380, at *9 (finding that the ALJ did not err by failing to include the claimant's mild mental limitations in activities of daily living and concentration, persistence, or pace in the RFC, where the claimant had received no specialized treatment for her mental condition and her symptoms were adequately controlled with medication).

Consequently, the opinions of Drs. Johnson and Larsen finding moderate mental limitations is amply refuted by other evidence of record—namely, the observations of Pomeroy's largely normal mental status by the non-mental health specialists, Pomeroy's lack of participation in specialized mental health evaluation or counseling, her failure to even mention her mental impairments when asked by the ALJ at the hearing about the reasons she could not work, and her fairly full range of daily activities. As such, the ALJ reasonably discounted the opinions of Drs. Johnson and Larsen and reasonably found that Pomeroy's mental impairment was non-severe. *See Simila*, 573 F.3d at 515; *Briscoe ex rel. Taylor*, 425 F.3d at 345; *Wilder*, 64

F.3d at 337.

*D. Substantial Evidence Supports the ALJ's Decision to Assign "Little Weight" to Dr. Combs's Restrictions*

Next, Pomeroy challenges that the ALJ's decision to assign "little weight" to the upper extremity restrictions articulated by Dr. Comb in August 2011. To review, Dr. Comb performed a carpal tunnel release on Pomeroy in July 2011 and then released her to return to work the following month, restricting her from performing repetitive work with the upper extremities and lifting or carrying more than three pounds. (AR 24 (citing AR 321)). Because the ALJ adequately supported her decision to discount Dr. Combs's restrictions, Pomeroy's second argument is also unavailing.

To reiterate, the ALJ "is not required or indeed permitted to accept medical evidence if it is refuted by other evidence . . . ." *Simila*, 573 F.3d at 515 (quoting *Wilder*, 64 F.3d at 337); *see also Briscoe ex rel. Taylor*, 425 F.3d at 356. Here, the ALJ observed that Dr. Combs assigned these upper extremity limitations in the month following Pomeroy's carpal tunnel release surgery. (AR 24). As the ALJ observed, there is no convincing evidence that Pomeroy remained so limited for a period of 12 months. (AR 24).

In arriving at this conclusion, the ALJ considered that Dr. Stewart graded Pomeroy's grip strength as a "4/5" in February 2012. (AR 340). The ALJ also noted that throughout 2011, Dr. Panszi, Pomeroy's neurologist, documented normal findings in range of motion and strength in her extremities, without pain, and his notes contained no references to difficulties with grip strength or fine motor ability. (AR 368-74). In August 2012, Dr. Terpstra found that Pomeroy's muscle strength, tone, and grip strength were "5/5" and that her fine and gross motor movements were normal. (AR 388). Although Dr. Hughes, Pomeroy's rheumotologist, documented in May

2012 that Pomeroy's upper extremity strength was "4 minus" and her grip strength "60%," the results of his strength testing in November 2011 was normal. (AR 333, 337). Nor did Dr. Hughes note any difficulty with fine motor movements. (AR 331-38). The ALJ further observed that although electrodiagnostic studies in November 2012 revealed that Pomeroy still had mild median neuropathy, there was no denervation. (AR 29 (citing AR 437)). Additionally, the ALJ considered that Dr. Hughes opined in August 2011 that Pomeroy could lift 15 to 20 pounds and Dr. Terpstra opined in August 2012 that Pomeroy could lift and carry more than 10 pounds occasionally and less than 10 pounds frequently.[7] (AR 27-28 (citing AR 295, 388, 391)).

From all of this medical evidence, the ALJ reasonably inferred that while Pomeroy may have been initially limited as indicated by Dr. Combs when returning to work shortly after her carpal tunnel surgery, she did not remain so limited for a period of 12 months. *See Stevenson v. Chater*, 105 F.3d 1151, 1155 (7th Cir. 1997) (acknowledging that an ALJ is entitled to make reasonable inferences form the evidence before him). Pomeroy contends that while Dr. Combs's three-pound lifting restriction may have been refuted by subsequent evidence, his restriction against repetitive work with the upper extremities was not. But that is not the case. Drs. Corcoran and Brill, the state agency physicians, specifically opined in August and October 2012, respectively, that Pomeroy could perform unlimited pushing or pulling with her upper extremities and that she did not require any upper extremity manipulative limitations, such as in reaching, handling, fingering, or feeling. (AR 408, 410, 541). When the record contains conflicting medical evidence, the ALJ has an affirmative responsibility to resolve that conflict,

[7] The Court, from its own review of the record, additionally notes that when Pomeroy was discharged from occupational therapy in October 2011, her strength was within functional limits in both upper extremities. (AR 317).

*Stephens*, 766 F.2d at 287, and here the ALJ's method of doing so was reasonable and adequately explained. The Court "do[es] not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Clifford*, 227 F.3d at 869 (collecting cases).

Therefore, Pomeroy's second argument is also unpersuasive. The ALJ adequately explained why she discounted the restrictions articulated by Dr. Combs in August 2011, and her decision to do so is supported by substantial evidence.

*E. The ALJ's Credibility Determination Will Not Be Disturbed*

In her final argument, Pomeroy asserts that the ALJ improperly discounted the credibility of her symptom testimony. For the following reasons, the ALJ's credibility determination will not be disturbed.

An ALJ's credibility determination is entitled to special deference because the ALJ is in the best position to evaluate the credibility of a witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and she articulates her analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988) (citation omitted), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) (citation omitted), her determination will be upheld unless it is "patently wrong," *Powers*, 207 F.3d at 435; *see Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness"); *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1995) ("[Because] the ALJ is in the best position to observe witnesses, [courts] usually do not upset credibility determinations on appeal

so long as they find some support in the record and are not patently wrong." (citations omitted)).

The ALJ found that Pomeroy's symptom testimony was "not entirely credible" based on her use of a cane without medical necessity or a prescription, her somewhat full range of daily activities, the objective medical evidence, and the rather conservative treatment prescribed for her conditions. (AR 28). Pomeroy contests three of these four reasons.

Pomeroy's challenge to the ALJ's consideration of her use of a cane without a prescription has some traction, as the Seventh Circuit has articulated that "the fact that an individual uses a cane not prescribed by a doctor is not probative of [her] need for the cane in the first place." *Eaken v. Astrue*, 432 F. App'x 607, 613 (7th Cir. 2012) (citing *Terry v. Astrue*, 580 F.3d 471, 477-78 (7th Cir. 2009)). But the ALJ's observation that a cane may not be medically necessary does have some support in the record. Although Pomeroy claimed at the July 2013 hearing that Dr. Stewart encouraged her to use a cane (AR 91), Dr. Stewart's July 2012 report indicated that Pomeroy's ambulation had not been affected by her conditions and that an assistive device had *not* been recommended (AR 341). It is possible, of course, that Dr. Stewart's recommendation changed at some point after July 2012 and before the July 2013 hearing; however, Pomeroy does not point to any documentation in the record to show that it did.

Next, Pomeroy argues that her daily activities do not support a discounting of her credibility. She emphasizes that she must rest after performing 10 to 15 minutes of activity, and that when she has a headache, she stays in bed. Contrary to Pomeroy's assertions, the ALJ properly considered her daily activities. *See* 20 C.F.R. § 404.1529(c)(3); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). The ALJ noted that despite Pomeroy's claim of constant fatigue and high pain levels, Pomeroy could drive, cook, do laundry, vacuum, make her bed, perform her

self care, wash dishes, wipe down counters, pay bills, count change, handle bank accounts, and grocery shop with others. (AR 26-28). These activities are relevant to her ability to stand, walk, and use her hands. The ALJ properly considered Pomeroy's activities as just one factor in the credibility analysis and wisely did not place "undue weight on [her] household activities in assessing [her] ability to hold a job outside the home." *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006) (collecting cases).

Additionally, the ALJ found that the objective medical evidence does not support Pomeroy's claim of disabling pain and fatigue. Pomeroy challenges this reason only by cursorily referring to her arguments about the ALJ's discounting of the opinions of Drs. Johnson, Larsen, and Combs. (DE 18 at 14-15; DE 30 at 4). The Court has already explained *supra* why Pomeroy's challenge to the ALJ's consideration of these doctors' opinions is unpersuasive.

Pomeroy does not challenge the ALJ's consideration of the treatment that she underwent for her conditions. The ALJ observed that Pomeroy had been prescribed various medications, none of which cause her to suffer significant side effects. (AR 28; *see* AR 77, 84-85). The ALJ noted that Pomeroy had not undergone, or been recommended to have, any surgical procedures on her cervical spine. (AR 28-29). As such, in assessing Pomeroy's credibility, the ALJ considered the relatively conservative treatment that she had undergone for her ailments. *See Simila*, 573 F.3d at 519 (affirming the ALJ's consideration of claimant's relatively conservative treatment history when discounting the severity of her symptom testimony); 20 C.F.R. § 404.1529(c)(3) (stating that the treatment a claimant has undergone is a factor to be considered when assessing the credibility of a claimant's complaints).

In sum, "an ALJ's credibility assessment will stand 'as long as [there is] some support in

the record.'" *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) (alteration in original) (quoting *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)). When assessing the credibility of Pomeroy's symptom testimony, the ALJ built an adequate and logical bridge between the evidence and her conclusion, *see Ribaudo*, 458 F.3d at 584, and her conclusion is not "patently wrong," *Powers*, 207 F.3d at 435. Consequently, the ALJ's credibility determination, which is entitled to special deference, *Powers*, F.3d at 435, will not be disturbed.

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The Clerk is directed to enter a judgment in favor of the Commissioner and against Pomeroy.

SO ORDERED.

Enter for this 30th day of March 2016.

/s/ Susan Collins
Susan Collins,
United States Magistrate Judge